MILKO V. MATEO,

        **Plaintiff,**

    **vs.**

**NESTLE WATERS NORTH AMERICA, INC.,**

      **Defendant.**

Civ. No. 2:13-cv-7270-KM-MAH

**OPINION**

### KEVIN MCNULTY, U.S.D.J.:

Plaintiff Milko Mateo sues defendant Nestle Waters North America under Title VII and the New Jersey Law Against Discrimination based on allegations of discrimination, a hostile work environment, and retaliation. The defendant's motion for summary judgment (ECF no. 78) is now before the court.

## I.  BACKGROUND[1]

---

[1]    Certain citations to the record are abbreviated as follows:

    Def. Br. = Defendant Nestle Waters North America Inc.'s Brief in Support of Summary Judgment (ECF No. 78-1)

    DSF = Defendant's Local Civil Rule 56.1 Statement of Undisputed Material Facts (ECF No. 78-2)

    Fenton Dep. = Deposition of Christie Fenton (ECF No. 78-5, ex. G)

    Mateo Dep. = Deposition of Milko Mateo (ECF No. 78-5, ex. F; ECF No. 83, ex. W(1))

    PRDSF = Plaintiff's Response to Defendant's Statement of Facts (ECF No. 83, pp. 5-9)

    PSF = Plaintiff's Statement of Material Facts (ECF No. 83, pp. 9-28)

    DRPSF = NWNA's Response to Plaintiff's Statement of Alleged Material Facts (ECF No. 84-1)

## A. Factual History

Plaintiff Milko Mateo ("Mr. Mateo") is a thirty-six-year-old man originally from the Dominican Republic. (PSF ¶ 1; DRPSF ¶ 1). Mr. Mateo worked at a Nestle Waters North America Inc. ("NWNA") distribution center in Kearny, New Jersey from around May 2012 until he was terminated on September 3, 2013. (DSF ¶¶ 1-3, 40; PRDSF ¶¶ 1-3, 40). Mr. Mateo describes himself as gay or bisexual. (PSF ¶ 3). Mr. Mateo alleges that he was discriminated against on the basis of sex, gender stereotypes, and sexual orientation, experienced a hostile work environment, and was terminated by NWNA in retaliation for raising allegations of harassment. (ECF No. 25).

### i. Mr. Mateo Starts Working at NWNA's Distribution Center

Mr. Mateo started working at the NWNA distribution center in Kearny, New Jersey around May 2012. (DSF ¶¶ 1-3; PRDSF ¶¶ 1-3). He was initially assigned by a staffing firm, On Target, to work as a forklift operator. (DSF ¶ 3); PRDSF ¶ 3). NWNA directly hired Mr. Mateo as a part-time forklift operator around October 2012; they later hired him full-time. (DSF ¶ 4; PRDSF ¶ 4).

NWNA provided Mr. Mateo with a copy of NWNA's harassment and retention policy at the start of his employment. (DSF ¶ 5; PRDSF ¶ 5; ECF No. 78-7, ex. A). NWNA's policy prohibits harassment and retaliation in the workplace on the basis of sex and sexual orientation. (DSF ¶ 5; PRDSF ¶ 5; ECF No. 78-7, ex. A). Mr. Mateo also attended harassment training with Christie Fenton, NWNA's Area Human Resource Manager. (DSF ¶ 5; PRDSF ¶ 5). The training communicated that Mr. Mateo was "supposed to speak to [his] manager of human resources" if he had any complaints. (DSF ¶ 6; PRDSF ¶ 6). NWNA states it conducts annual harassment training for all its workers. (DSF ¶ 7; PRDSF ¶ 7). This training includes a PowerPoint presentation, a video, a review of the anti-harassment policy and a quiz. (DSF ¶ 7; PRDSF ¶ 7). It lasts approximately thirty to thirty-five minutes. (Fenton Dep. 17:13-22).

### ii. Mr. Mateo Alleges Initial Harassment

Mr. Mateo reports that, at first, he had a good working relationship with his supervisor and coworkers. (PSF ¶ 7). However, Mr. Mateo states that "all of the guys," including his supervisor, Pedro Rodriguez, made anti-gay remarks in his presence. (PSF ¶¶ 4-6). The employees who allegedly made anti-gay remarks include Wascar Benton Garcia, Luis Martinez, Steven Salvador, Troy DeBerry, Willie Grant, Michael Bocofobia, and Angel Hernandez. (PSF ¶¶ 5-6).

According to Mr. Mateo, Mr. Salvador made anti-gay comments and physically touched him on several occasions. Mr. Mateo claims that Mr. Salvador would, on a regular basis, refer to Mr. Mateo as "my woman" or "that's one of mine." (Mateo Dep. 24:4-16). Mr. Salvador allegedly would touch Mr. Mateo's nipples and say, "you want to suck my dick." (Mateo Dep. 24:16-18). Mr. Salvador allegedly told Mr. Mateo, "I really like the way those shorts look on you," "spread [your] legs," and, "it doesn't matter who's giving up the ass, as long as they were fucking." (Mateo Dep. 24:19-20; ECF No. 83-1, ex. I). Mr. Salvador allegedly asked Mr. Mateo to help him "relieve his frustration in an empty truck" and also called Mr. Mateo a "cocksucker." (ECF No. 83-1, ex. I). According to Mr. Mateo, Mr. Salvador made these comments for several months. (Mateo Dep. 24:12-25:2).

Mr. Mateo alleges that Mr. Salvador made these comments in front of Mr. Rodriguez, his supervisor, and Mr. Martinez. (Mateo Dep. 25:3-16). Mr. Salvador allegedly started yelling at Mr. Mateo, "you are mine" and "I will slap you" in Spanish, in front of Mr. Rodriguez and Mr. Martinez. (Mateo Dep. 25:3-16).

Mr. Mateo produced a document, allegedly from the summer of 2012, which details these allegations about Mr. Garcia. (ECF No. 83-1, ex. I). It is unclear whether this document was provided to Ms. Fenton or NWNA at the time. Mr. Mateo alleges that he submitted written reports to NWNA. (PRDSF ¶ 29; ECF No. 87-3, exs. I, J).

Mr. Mateo also claims that Mr. Martinez, on a regular basis, would intentionally drive the forklift near him and step on the gas so he would be exposed to fumes. (PSF ¶ 9; Mateo Dep. 25:19-24).

### iii. February 2013 Knife incident with Mr. Martinez

Mr. Mateo alleges that Mr. Martinez threatened him with knives around February 2013. (PSF ¶ 10). Mr. Mateo allegedly walked into the lunchroom and saw Mr. Martinez standing five or ten feet away with two large knives. (PSF ¶ 10). Mr. Martinez allegedly said, "let's kill each other" and threw a knife at him; Mr. Mateo did not have a knife on him. (PSF ¶ 10). According to Mr. Mateo, his supervisor, Mr. Rodriguez, walked into the lunchroom; Mr. Martinez threw a knife in Mr. Rodriguez's hand and said, "let's kill each other." (PSF ¶ 10). Mr. Martinez then allegedly said, "I can't find anyone that wants to kill themselves with me." (PSF ¶ 10).

Mr. Mateo says he did not report the February 2013 knife incident to anyone at that time. (PSF ¶ 10). Nonetheless, Mr. Mateo's supervisor, Mr. Rodriguez, allegedly witnessed part of the incident. (PSF ¶ 10).

NWNA claims that Mr. Martinez "never said anything to [Mr. Mateo] of a sexual nature" during the knife incident and Mr. Mateo "did not document ... a single instance of Mr. Martinez telling an anti-gay joke." (DRPSF ¶ 10). Mr. Mateo, however, states that Mr. Martinez regularly made anti-gay comments in his presence. (PSF ¶¶ 5-6, 10).

### iv. Alleged Harassment From Mr. Garcia

Mr. Mateo alleges that Wascar Garcia, a coworker, made repeated harassing comments about his sexual orientation. (PSF ¶ 11). According to Mr. Mateo, Mr. Garcia came "right in front of my face" and said, "you're gay." (PSF ¶ 11). Mr. Garcia also allegedly called Mr. Mateo "batty boy," said to be a Jamaican derogatory term for a gay man. (PSF ¶ 11; DSF ¶ 27). According to Mr. Mateo, Mr. Garcia would frequently sing songs about "batty boys" when Mr. Mateo walked into the lunchroom; Mr. Garcia allegedly looked directly at Mr. Mateo when he was singing the songs. (PSF ¶ 11; Mateo Dep. 28:18-29:15,

4

30:2-6). Mr. Mateo claims he had to stop sitting with his coworkers in the lunchroom because of this behavior. (PSF ¶ 12b).

### v. Mr. Salvador Leaves NWNA

According to NWNA, Mr. Salvador's employment with NWNA ended on March 15, 2013. (DSF ¶ 32). NWNA does not state why Mr. Salvador no longer works for the company. Mr. Mateo recalls, "I was told it was medical reasons, but I really don't know why." (Mateo Dep. 26:6 11). Ms. Fenton stated, "I believe it had something to do with, like, him not returning after calling out of work a couple days of sick." (Fenton Dep. 69:9 17). I will assume, at least for the purpose of this motion, that Mr. Salvador's conduct toward Mr. Mateo does not relate to Mr. Salvador's leaving NWNA.

### vi. Mr. Mateo Reports Alleged Harassment

Mr. Mateo reported anti-gay harassment to Ms. Fenton, NWNA's Area Human Resources Manager, around early July 2013. (DSF ¶¶ 5, 14; PRDSF ¶ 14; Mateo Dep. 29:16-30:9, 30:24-31:3). Ms. Fenton testified that Mr. Mateo asked, "What do I need to do to file a complaint?" (PSF ¶ 33; DRPSF ¶ 33).

Mr. Mateo told Ms. Fenton that he was being harassed because of his sexual orientation. (PSF ¶ 34c). Ms. Fenton recalls that Mr. Mateo mentioned that "he felt uncomfortable based on jokes and looks that he had been given" and reported the February 2013 knife incident with Mr. Martinez. (PSF ¶ 34b). Ms. Fenton testified that "did not mention anything about that [specific incident] having to do with his sexual orientation whatsoever that I recall." (PSF ¶ 34c). According to Mr. Mateo, Ms. Fenton asked, "How did Wascar [Garcia] find out [about your sexual orientation]?" (Mateo Dep. 30:7-12). Mr. Mateo claims that Ms. Fenton said "don't tell me" about the knife incident "because now I have to open an investigation." (PSF ¶ 18a).

Mr. Mateo claims reported Mr. Salvador's comments and actions toward him at this time, including the requests for sexual favors. (PSF ¶ 34c). The parties dispute the issue of when Mr. Mateo reported the comments about Mr. Salvador to Ms. Fenton: NWNA and Ms. Fenton claim Mr. Mateo first reported

these comments in July 2013; Mr. Mateo claims that he reported these comments earlier. (Mateo Dep. 30:24-31:3). Mr. Mateo presents documents purporting to be written allegations of harassment in the summer of 2012. (ECF No. 87-1, exs. I, J).

Setting aside the issue of the date, Ms. Fenton testified that Mr. Salvador's alleged comments did not relate to Mr. Mateo's sexual orientation as such. Ms. Fenton testified that Stephen Salvador "asked [Mr. Mateo] for sexual favors, something along those lines, not to do with Milko[ Mateo]'s sexual orientation, but that gentleman had approached him regarding sexual favors." (PSF ¶ 34c; DRPSF ¶ 34c).

Mr. Mateo asked Ms. Fenton to keep the conversation confidential; Ms. Fenton agreed. (DSF ¶¶ 16-17; PRSF ¶¶ 16-17). Mr. Mateo said he wanted to keep the conversation confidential because he was afraid of losing his job. (PSF ¶ 13).

NWNA and Ms. Fenton provide unclear and conflicting explanations of the company's response to Mr. Mateo's allegations. First, NWNA states that it did not investigate Mr. Mateo's allegations of harassment because he requested confidentiality. NWNA alleges that, without a request for confidentiality, the typical response to a harassment complaint is an immediate investigation followed by appropriate discipline. (DSF ¶ 18).

NWNA cites, as an example, a separate incident when it allegedly issued a final written warning to a male customer service representative for, in part, indicating that a male coworker "looked like a homosexual, with his long hair and nose ring." (DSF ¶ 18). NWNA cites a Report of Performance Problem Resolution ("RPPR") (ECF No. 78-7, ex. G) in support of this claim. This RPPR, however, makes no mention of sexual orientation or specific derogatory language. It merely states that the employee had "[s]everal instances of inappropriate conduct in violation of NWNA's harassment policy" and that "[d]eragatory language/comments and distracting behavior" were displayed.

(ECF No. 78-7, ex. G). While it refers to harassing language and behavior, there is no indication that these were motivated by sexual orientation.

Second, Ms. Fenton claims that NWNA did not investigate Mr. Mateo's complaints because Mr. Mateo "failed to raise any specific allegations." (DRPSF ¶ 49a). Ms. Fenton states that NWNA cannot accommodate requests for confidentiality; NWNA's policy is to investigate all complaints of harassment. (PSF ¶ 49b; DRPSF ¶ 49b). Ms. Fenton testified that Mr. Mateo "refused" to provide her specifics or share witness's names. (DRPSF ¶ 49a).

### vii.  Annual Harassment Training

Ms. Fenton conducted NWNA's annual harassment awareness training on July 11, 2013. (DSF ¶ 20; PRDSF ¶ 20). NWNA claims that the training was done in response to Mr. Mateo's allegations, but also states that it was "NWNA's annual harassment awareness training." (DSF ¶ 20; PRDSF ¶ 20; Fenton Dep. 15:20-16:9). Mr. Mateo did not attend the session because he was sick and absent from work. (DSF ¶ 20; PRDSF ¶ 20). Mr. Garcia was in attendance. (DSF ¶ 20; PRDSF ¶ 20).

According to NWNA, Mr. Mateo never heard another anti-gay remark or joke in the workplace after the annual training. (DSF ¶ 21; PRDSF ¶ 21). Mr. Mateo alleges, however, that he continued to receive threats of physical harm from Mr. Garcia and Mr. Martinez. (PRDSF ¶ 21). Moreover, as noted below, NWNA admits that Mr. Garcia used a derogatory term for gay males in the workplace six days after the training. (DSF ¶ 27).

### viii.  July 2013 Fan Incident with Mr. Garcia

On July 17, 2013, six days of the annual harassment awareness training, Mr. Mateo and Mr. Garcia engaged in an argument over the placement of fans in the warehouse. (DSF ¶ 22; PRDSF ¶ 22).

According to NWNA, Mr. Mateo and Mr. Garcia made inappropriate remarks to each other, used profanity, and had to be separated by another employee. (DSF ¶ 25). NWNA claims that Mr. Mateo instigated the incident.

NWNA reports an eyewitness stating that Mr. Mateo called Mr. Garcia a "pussy." (DSF ¶ 34).

According to Mr. Mateo, Mr. Garcia instigated the incident. (PSF ¶ 15). Mr. Garcia allegedly started yelling, "I don't like you, I can't stand you, I need the fan in the back .... I don't want to have to f--- you up .... [W]ait until we get out of the warehouse, I'm going to f--- you up." (PSF ¶ 15). Mr. Mateo admits telling Mr. Garcia "let's go outside" to fight. (DSF ¶ 22; PRDSF ¶ 22). Mr. Mateo denies calling Mr. Garcia a "pussy." (Mateo Dep. 40:19-20).

Mr. Garcia admitted to singing a song containing the term "batty boy," a Jamaican derogatory phrase for a gay male, during this incident. (DSF ¶ 27). He allegedly called Mr. Mateo "batty boy" on several occasions. (Mateo Dep. 28:18-29:15, 30:2-6). The RPPR form for the July 2013 fan incident states: "Wascar [Garcia] admits to singing a song that contains an inappropriate terms which was considered offensive by another team member as it relates to gender orientation. This type of behavior is a violation of our ... harassment policy." (ECF No. 78-7, ex. H).

Mr. Mateo allegedly reported the incident to his supervisor, Mr. Rodriguez. (PRDSF ¶ 22). NWNA claims that Mr. Mario Valenti, an HR generalist with NWNA, investigated the incident and interviewed eyewitnesses. (DSF ¶¶ 23-25). Mr. Valenti testified that he thought Mr. Garcia's use of the term "batty boy" was "not appropriate," but "didn't feel that [Mr. Garcia] was doing it intentionally toward Milko [Mateo]." (PSF ¶¶ 23, 29; DRPSF ¶¶ 23, 29).

Mr. Valenti recommended that Mr. Mateo and Mr. Garcia receive final written warnings. (DSF ¶ 26; PRDSF ¶ 26). Mr. Mateo and Mr. Garcia received these written warnings, dated July 22, 2013. (DSF ¶ 26; PRDSF ¶ 26; ECF No. 78-7, ex. H). Mr. Mateo alleges that he was "pressured" to sign the final written warning by Mr. Valenti and Mr. Alex Auld, even though Mr. Mateo disputed the description of the incident. (Mateo Dep. 44:5-24).

Ms. Fenton was asked whether she was concerned that "only six days later [after the training] there was an incident between [Mr. Garcia] and [Mr. Mateo] again?" (PSF ¶ 52c; DRPSF ¶ 52c). Ms. Fenton stated:

> I certainly can't control actions people take after training that I've obviously rolled out. What people choose to do is their own prerogative. So I can't necessarily say the two are related. If somebody doesn't take the training for how I roll it out, you know, obviously there's consequences for that.

(PSF ¶ 52c; DRPSF ¶ 52c). Regarding the period after the time clock incident, Ms. Fenton said, "I don't see him asking us to investigate any specific incident … there's nothing here specifically for me to have investigated." (PSF ¶ 57b; DRPSF ¶ 57b).

### ix. Mr. Mateo Appeals the July 2013 Final Written Warning

Mr. Mateo appealed the July 22, 2013 final written warning. (DSF ¶ 28; PRDSF ¶ 28). The parties disagree about whether this was the first time Mr. Mateo mentioned that he was subject to inappropriate conduct as a result of his sexual orientation. (DSF ¶ 29; PRDSF ¶ 29).

According to NWNA, Mr. Mateo first alleged that he was harassed because of his sexual orientation during the appeal of the July 2013 final written warning. (DSF ¶ 29). NWNA alleges that Mr. Mateo "never advised anyone at NWNA that he was gay" until about July 27, 2013. (DSF ¶ 31). NWNA states that Mr. Mateo's appeal of the July 2013 warning was the first time he reported Mr. Salvador's request for sexual favors, that Mr. Martinez had threatened him with knives, and that Mr. Martinez would step on the gas of the forklift so Mr. Mateo would breathe in fumes. (DSF ¶ 29; PRDSF ¶ 29).

Mr. Mateo responds that, regardless of whether he "had issued a 'statement' that he was gay," "he was openly treated as gay by fellow workers." (PRDSF ¶ 31). According to Mr. Mateo, the anti-gay harassment was not presented for the first time on the appeal. Mr. Mateo had allegedly submitted various written statements to NWNA, and Mr. Rodriguez allegedly was present during part of the February 2013 knife incident with Mr. Martinez. (PRDSF

9

¶ 29). Mr. Mateo also states that he reported anti-gay harassment to Ms. Fenton in early July 2013 before the fan incident. (DSF ¶ 5, 14; Mateo Dep. 29:15-30:19, 30:24-31:3).

NWNA denied Mr. Mateo's appeal of the July 22, 2013 final written warning. (DSF ¶ 35; PRDSF ¶ 35).

### x. Mr. Mateo Alleges Meeting with Ms. Fenton and Mr. Palin

According to Mr. Mateo, Ms. Fenton and Jeff Palin, an NWNA employee, spoke to Mr. Mateo on August 19, 2013 about the actions of Mr. Garcia and Mr. Martinez's actions. Ms. Fenton and Mr. Palin allegedly said they "can't have this continue." (PSF ¶ 21).

### xi. August 2013 Time Clock Incident

Mr. Mateo and Mr. Martinez were involved in another altercation on August 28, 2013. (DSF ¶ 36). According to NWNA, Mr. Martinez was attempting to "clock in" for his shift and Mr. Mateo allegedly said "Fuck you get out of my way." (DSF ¶ 36). NWNA alleges that Mr. Mateo instigated the incident, acted inappropriately, and used offensive language. (DSF ¶ 37). According to NWNA, NWNA's warehouse manager, Mr. Dan O'Leary, investigated the incident. (DSF ¶ 37).

According to Mr. Mateo, Mr. Mateo was checking records on the time clock when Mr. Martinez tried to use the clock; Mr. Mateo allegedly said, "I'm sorry, just give me a second" and Mr. Martinez said, "no, no, no, no, get out of my way... don't mess with me... don't mess with me ... excuse me, asshole." (PSF ¶ 19). According to Mr. Mateo, Mr. Martinez told him, "why don't you make me shut up" and then Mr. Mateo "just walked away." (PSF ¶ 19). Mr. Mateo admits calling Mr. Martinez an "asshole" during their interaction. (DSF ¶ 38; PRDSF ¶ 38).

### xii. NWNA's Response and Mr. Mateo's Termination

NWNA then terminated Mr. Mateo, allegedly because he was "on a final written warning" when the August 28, 2013 incident happened. (DSF ¶ 40).

NWNA terminated Mr. Mateo effective September 3, 2013. (DSF ¶ 40; PRDSF ¶ 40). Mr. Mateo claims that the following people were involved in the decision to terminate him: Alex Auld, Division Logistics Manager; Nick Triantafell, Zone General Manager, NY; and Dan O'Leary, Zone Warehouse Manager, Kearny. (PSF ¶ 45). NWNA does not admit that these individuals were involved in the termination decision. (DRPSF ¶ 45).

Mr. Martinez was issued a "write up" as a result of the August 28, 2013 incident. (DSF ¶ 41; PSF ¶ 62c; DRPSF ¶ 62c). Ms. Fenton commented, "This was the level of discipline that was administered to Luis Martinez for the same incident which Milko [Mateo] was terminated for." (PSF ¶ 62c; DRPSF ¶ 62c). NWNA responds that Mr. Martinez "had not previously been disciplined for any workplace confrontations." (DSF ¶ 41). Again, Mr. Mateo claims that Mr. Martinez instigated the February 2013 knife incident. (PRDSF ¶ 41).

NWNA claims that Mr. Mateo's dismissal is consistent with discipline meted out for other incidents involving employee altercations. (DSF ¶¶ 42-45).

### xiii. NWNA's Commentary on its Human Resources Policies

Ms. Fenton, NWNA's HR manager, claims that NWNA has a "zero tolerance policy" toward harassment. (PSF ¶ 50a; DRPSF ¶ 50a). Ms. Fenton testifies that, under a zero tolerance policy, "once we are made aware that a behavior has been exhibited, that we don't allow it to continue again.... not necessarily that the person is going to automatically lose their job." (PSF ¶ 50a; DRPSF ¶ 50a). Mr. Garcia and Mr. Martinez continue to be employed by NWNA. (PSF ¶ 50a; DRPSF ¶¶ 50a, 62b, 62c).

NWNA reports that it employs openly gay individuals, including an openly gay woman who has worked at NWNA for thirty-four years. (DSF ¶ 19; ECF No. 78-8). According to NWNA, the openly gay woman has never heard any anti-gay or homophobic remarks at work; she has allegedly never complained of harassment or inappropriate conduct based on her sexual orientation. (DSF ¶ 19; ECF No. 78-8). Notably, however, NWNA admits that a male coworker at

11

NWNA was subject to anti-gay remarks—i.e., that he "looked like a homosexual with his long hair and nose ring." (DSF ¶ 18).

### xiv. Alleged Disciplinary Issues with Mr. Mateo

NWNA reports that it had several disciplinary issues with Mr. Mateo around this time. A Report of Performance Problem Resolution ("RPPR") dated February 28, 2013 states that Mr. Mateo questioned his supervisor as to why he was assigned particular tasks, "had an altercation with [Mr. Martinez]," and sometimes had misunderstandings regarding his task assignment. (ECF No. 78-7, ex. C; DSF ¶ 9). A Workwith Form dated March 7 states that Mr. Mateo failed to complete certain assignments as directed. (ECF No. 78-7, ex. D; DSF ¶ 11). A RPPR dated April 15, 2013 reports that Mr. Mateo had a second accident while driving a forklift; he would be recertified and then permitted to keep working. (ECF No. 78-7, ex. E; DSF ¶ 12). RPPRs from July 8 and August 12, 2013 state that Mr. Mateo received warnings for poor attendance. (ECF No. 78-7, ex. F; DSF ¶ 13).

### xv. Alleged Dishonesty on Mr. Mateo's Application

Mr. Mateo completed his NWNA employment application in October 2012; he certified that all statements made in the application were true. (DSF ¶ 47; PRDSF ¶ 47). The NWNA employment application required Mr. Mateo to identify each of his employers during the past ten years, the dates of employment, and the reason for the separation. (DSF ¶ 49; PRDSF ¶ 49). Mr. Mateo listed U.S. Polo and Abercrombie & Fitch as previous employers. (DSF ¶ 50; PRDSF ¶ 50).

Mr. Mateo stated that he left U.S. Polo for "personal reasons." (DSF ¶¶ 50-51; PRDSF ¶¶ 50-51). He claims another employee started a fight with him and that he therefore chose not to return to that job. (Mateo Dep. 84:11-85:11). An alleged "Employment Termination Notice" from U.S. Polo states that Mr. Mateo was terminated for "misconduct" and that he "put employees and customers in danger." (DSF ¶ 52; ECF No. 78-7, ex. P). Mr. Mateo claims that this notice "does not describe the events that occurred"; Mr.

Mateo disputes the accuracy of that notice and states he was never fired. (PRDSF ¶ 52; ECF No. 78-7, ex. P; Mateo Dep. 85:20-86:20).

Mr. Mateo stated that he left Abercrombie & Fitch because it was a seasonal job. (DSF ¶ 53; PRDSF ¶ 53; Mateo Dep. 87:1-10). An alleged "Unsatisfactory Performance Notice" from Abercrombie & Fitch states that Mr. Mateo was terminated for poor attendance. (DSF ¶ 54; PRDSF ¶ 54; ECF No. 78-7, ex. Q).

According to NWNA, Mr. Mateo omitted from his employment application at least seven prior employers in the ten-year reporting period. (DSF ¶ 55). Mr. Mateo, however, points to his resume, produced in discovery by defendants and allegedly included in Mr. Mateo's job application; the resume lists six of the seven prior employers that Mr. Mateo allegedly omitted. (PRDSF ¶ 55; ECF No. 78-7, ex. R).

Mr. Mateo was terminated by Smart Carte and Madison Square Garden. (DSF ¶ 56; PRDSF ¶ 56). According to NWNA, a document allegedly from Smart Carte reports that Mr. Mateo was terminated for attendance problems, "insubordination," and using "profane language." (DSF ¶ 57; ECF No. 78-7, ex. S). According to NWNA, a document allegedly from MSG indicates that Mr. Mateo was terminated for "poor work performance" and for allegedly falsifying his time sheet. (DSF ¶ 58). Mr. Mateo disputes the accuracy of the documents and the descriptions of the incidents reported in them. (PRDSF ¶¶ 57-58).

NWNA claims that it was unaware that Mr. Mateo was untruthful on his employment application until after Mr. Mateo's termination. (DSF ¶ 59). Mr. Mateo denies being untruthful on his employment application. (PRDSF ¶ 59). NWNA claims that it would not have hired Mr. Mateo if it had known about the "misrepresentations, misstatements of fact and significant omissions set forth in his employment application." (DSF ¶ 60). NWNA alleges that it would have terminated Mr. Mateo "immediately upon learning of those misstatements of fact and significant omissions." (DSF ¶ 60). NWNA claims that it has

13

terminated or refused to hire at least two other employees for lying on their employment applications. (DSF ¶¶ 61-63).

## B. Pertinent Procedural History

After his September 3, 2013 termination from NWNA, Mr. Mateo filed an EEOC charge in late October 2013. (DSF ¶ 46; PRDSF ¶ 46; ECF No. 1). On November 22, 2013, the EEOC provided Mr. Mateo with a right-to-sue letter. (ECF No. 1, p. 2). Mr. Mateo filed a complaint, pro se, in this court on December 3, 2013, along with an IFP application. (ECF No. 1). Mr. Mateo's IFP application was approved. (ECF No. 2). NWNA filed a motion to dismiss on January 24, 2014. (ECF No. 10). Mr. Mateo obtained counsel by February 20, 2014. (ECF no. 15).

On May 7, 2014, I denied NWNA's motion to dismiss and granted Mr. Mateo's request to file an amended complaint. (ECF No. 24). Mr. Mateo filed an amended complaint on May 16, 2017. (ECF No. 25). The amended complaint asserts the following counts:

- **Count I:** Sex Discrimination (Gender Stereotyping) in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") (ECF No. 25, ¶¶ 75-86);
- **Count II:** Sexual Harassment (Hostile Work Environment) in violation of Title VII (ECF No. 25, ¶¶ 87-93);
- **Count III:** Retaliation in violation of Title VII (ECF No. 25, ¶¶ 94-100);
- **Count IV:** Discrimination on the Basis of Sexual Orientation in violation of the New Jersey Law Against Discrimination ("NJLAD") (ECF No. 25, ¶¶ 101-08);
- **Count V:** Discrimination on the Basis of Sex in violation of the NJLAD (ECF No. 25, ¶¶ 109-20);
- **Count VII:** Retaliation in violation of the NJLAD (ECF No. 25, ¶¶ 121-26);
- **Count VIII:** Hostile Work Environment in violation of the NJLAD (ECF No. 25, ¶¶ 127-42).

Mr. Mateo's counsel withdrew and Mr. Mateo eventually obtained new counsel. (ECF Nos. 45, 62). On November 9, 2017, NWNA filed a motion for summary judgment. (ECF No. 78). That is the motion currently before the court.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, ... there can be 'no genuine issue of

material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23).

In deciding a motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

The summary judgment standard, however, does not operate in a vacuum. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).

## III.  DISCUSSION

Mr. Mateo's causes of action can be organized in three categories: **(A)** sexual harassment and hostile work environment under Title VII and NJLAD; **(B)** gender stereotyping and sexual orientation discrimination under Title VII and NJLAD; and **(C)** retaliation under Title VII and NJLAD. I will discuss these allegations before addressing **(D)** the scope of Title VII regarding sexual orientation discrimination and **(E)** NWNA's after-acquired evidence defense.

### A. Sexual Harassment (Hostile Work Environment) under Title VII and NJLAD

To establish a hostile work environment claim against an employer under Title VII, a plaintiff must show that (1) he suffered intentional discrimination because of a protected classification; (2) the discrimination was severe or pervasive; (3) it detrimentally affected him; (4) it would have detrimentally affected a reasonable person of the same protected class in his position; and (5) there is a basis for vicarious liability. *See Cardenas v. Massey*, 269 F.3d 251, 260 (3d Cir. 2001); *see also Caver v. City of Trenton*, 420 F.3d 243, 262

(3d Cir. 2005); *Edmond v. Plainfield Bd. of Educ.*, 171 F. Supp. 3d 293, 309 (D.N.J. 2016). The elements of a hostile work environment claim under NJLAD resemble the first four elements of the Title VII hostile work environment claim. *Caver*, 420 F.3d at 262-63. NWNA argues that Mr. Mateo, "at a minimum," cannot establish the second and fifth prongs of his harassment claims. (Def. Br. 6). NWNA does not specifically address elements (1), (3), and (4). I will assume, for the purpose of this motion, that Mr. Mateo could establish those elements.

### i. Element (2): Severe and Pervasive

Whether Mr. Mateo was subject to "severe or pervasive" discrimination involves disputes of material fact. NWNA argues that **(a)** Mr. Mateo was subject to "occasional insults" that did not rise to the level of a hostile work environment and **(b)** Mr. Mateo "instigated both of the altercations resulting in the termination of his employment" and therefore cannot establish his claim. (Def. Br. 6-9).

**(a)** NWNA claims that Mr. Mateo was subject to "occasional incidents, teasing, or episodic instances of ridicule" that are insufficient to state a harassment claim. (Def. Br. 6-9). It is true that "'offhanded comments, and isolated incidents (unless extremely serious)' are not sufficient to sustain a hostile work environment claim." *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Title VII is not a "general civility code." *Faragher*, 524 U.S. at 788. Rather, to create a hostile work environment, the conduct must be so "extreme [as] to amount to a change in the terms and conditions of employment." *Id.*

NWNA has not met its burden of proving that Mr. Mateo could not convince a jury that he experienced "severe or pervasive" harassment. NWNA focuses on the fact that Mr. Mateo allegedly did not report the conduct until July 2013. (Def. Br. 7-8). That, however, relates more to the issue of vicarious liability, and only slightly to the issue of whether the conduct was "severe or pervasive." An individual can be subject to severe and pervasive harassment

from workers even if the employer lacks vicarious liability. *See Kent v. Henderson*, 77 F. Supp. 2d 628, 631-32 (E.D. Pa. 1999) ("[A]n employer is not always vicariously liable for a hostile work environment." (citing *Kunun v. Sears Roebuck & Co.*, 175 F.3d 289, 293-94 (3d Cir. 1999)).

Mr. Mateo has also testified to several serious incidents in the workplace that a jury could find "severe or pervasive." Mr. Mateo alleges that he was repeatedly called "batty boy," a derogatory term for gay men; referred to as "my woman"; told to "spread his legs"; asked to help a coworker "relieve his frustration in an empty truck"; and called a "cocksucker." (Mateo Dep. 24:4-25:2, 28:18-29:15, 30:2-6; ECF No. 83-1, ex. I; DSF ¶ 27). A coworker allegedly touched Mr. Mateo's nipples and said, "you want to suck my dick." (Mateo Dep. 24:16-18). A coworker that made anti-gay remarks and comments allegedly yelled, "I don't like you, I can't stand you .... I don't want to have to f--- you up .... [W]ait until we get out of the warehouse, I'm going to f--- you up." (PSF ¶ 15). Mr. Mateo alleges many other incidents of harassing conduct. Another coworker that made anti-gay remarks and comments allegedly threatened him with knives. (PSF ¶¶ 10-11).

**(b)** NWNA claims that Mr. Mateo instigated the July 2013 fan incident and the August 2013 time clock incident. (Def. Br. 8-9). However, Mr. Mateo testified that Mr. Garcia and Mr. Martinez, respectively, instigated those incidents. (PSF ¶¶ 15, 19; Mateo Dep. 37:23-39:24; 49:17-53:23). This is a credibility dispute that is not appropriate for resolution on summary judgment.

Summary judgment is appropriate where the evidence "is so one-sided that one party must prevail as a matter of law." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). NWNA has not shown that Mr. Mateo lacks sufficient evidence to support his hostile work environment claim. Therefore, NWNA cannot prove as a matter of law that Mr. Mateo was not subject to "severe or pervasive" harassment in the workplace. I will now turn to the issue of vicarious liability.

### ii. Element (5): Vicarious Liability

Whether NWNA has vicarious liability involves disputes of material fact that prevent summary judgment.[2] Under Title VII, liability turns on whether the harassers are supervisors or coworkers. *See Peace-Wickham v. Walls*, 409 F. App'x 512, 519 (3d Cir. 2010).

> If supervisors create the hostile environment, the employer is strictly liable, though an affirmative defense may be available where there is no tangible employment action. Alternatively, an employer will be liable for harassing conduct committed by a victim's coworkers if the employer "was negligent or reckless in failing to train, discipline, fire or take remedial action upon notice of harassment." An employer is negligent if it "knew or should have known about the harassment, but failed to take prompt and adequate remedial action." Importantly, even if a remedial action does not effectively end the alleged harassment, it may still be legally "adequate" if it was "reasonably calculated" to do so.

*Id.* (internal citations omitted). Similarly, employers are liable under NJLAD for the harassment of co-workers when the employer knew or should have known of the harassment. *Helmi v. New Jersey Transit Rail Corp.*, No. L-2398-06, 2010 WL 4861443, at *4 (N.J. Super. Ct. App. Div. Dec. 1, 2010).

Mr. Mateo and NWNA dispute material facts that are dispositive of the issue of vicarious liability, including **(a)** when Mr. Mateo first reported allegations of harassment and **(b)** whether NWNA took prompt and adequate remedial action.

**(a)** NWNA and Mr. Mateo dispute when Mr. Mateo first reported allegations of harassment. NWNA alleges that Mr. Mateo did not submit a report to human resources until July 2013. (DSF ¶¶ 5, 14). Mr. Mateo, however, testifies that his supervisor and the human resources department were aware of the alleged harassment: First, Mr. Mateo testifies that Mr.

---

[2]     This is an element in Title VII claims for sexual harassment, but is not an element for corresponding NJLAD claims. *See Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001). Employers can be held vicariously liable under NJLAD in some circumstances. The analysis is therefore relevant to the Title VII and NJLAD claims.

Rodriguez, his supervisor, made anti-gay remarks in his presence starting in 2012, witnessed Mr. Salvador sexually harassing him in 2012 and 2013, and witnessed Mr. Martinez threatening him with knives in February 2013. (Mateo Dep. 21:3-17, 25:3-16, 26:12-28:9). If Mr. Rodriguez qualifies as a "management level employee" under Title VII, NWNA may be deemed to have possessed knowledge of the alleged hostile work environment well before July 2013. *See Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 108-09 (3d Cir. 2009) (evaluating whether supervisors were management-level employees under Title VII).[3]

Second, Mr. Mateo alleges that he reported harassment to NWNA management-level employees in 2012 and earlier in 2013. Mr. Mateo produced a document, allegedly from the summer of 2012, which details alleged harassment by Mr. Garcia. (ECF No. 83-1, ex. I). It is unclear whether this particular document was provided to Ms. Fenton or NWNA at the time. Mr. Mateo states, however, that he submitted several written reports to NWNA. (PRDSF ¶ 29; ECF No. 87-3, exs. I, J).

Moreover, Mr. Mateo alleges that his supervisor, Mr. Rodriguez, made anti-gay remarks in his presence. If a supervisor creates the hostile work environment, the employer may be strictly liable. *See Peace-Wickham*, 409 F. App'x at 519. It is a factual dispute whether Mr. Rodriguez, potentially a supervisor, helped create a hostile work environment. (PSF ¶¶ 4-6; Mateo Dep. 21:3-17).

**(b)** Another major factual dispute is whether NWNA took prompt and adequate remedial action. An employer is liable under Title VII if the employer knew or should have known about the harassment and failed to take "prompt and adequate remedial action" that either ends the alleged harassment or is "reasonably calculated" to do so. *See Peace-Wickham*, 409 F. App'x at 519. NWNA provides contradictory responses here: NWNA claims that it did not

---

[3]    The parties do not address whether Mr. Rodriguez is a management-level employee for the purposes of Title VII and I do not decide this question at this stage.

investigate Mr. Mateo's allegations of harassment because he requested confidentiality; NWNA also claims that it did not investigate because Mr. Mateo "failed to raise any specific allegations." (DSF ¶¶ 16-18; DRPSF ¶ 49a). NWNA also claims that it appropriately responded to Mr. Mateo's allegations by conducting its "annual harassment awareness training" shortly after Mr. Mateo discussed harassment allegations with Mr. Fenton in July 2013. (DSF ¶ 20). It is unclear whether the annual training was conducted in response to Mr. Mateo's allegations. Contradicting itself, NWNA also alleges that Mr. Mateo did not report sexual orientation discrimination at all until *after* the July 2013 annual training. (DSF ¶¶ 29, 31).

It is also unclear from the record whether NWNA took steps "reasonably calculated" to end the harassment. Ms. Fenton reports that NWNA did not investigate Mr. Mateo's allegations. (DSF ¶¶ 16-18; DRPSF ¶ 49a). It is undisputed that NWNA conducted an approximately thirty-minute annual training on harassment awareness. However, it is unclear whether this routine training was "reasonably calculated" to end the harassment, which is alleged to have been severe, specific, and pervasive. Mr. Mateo's coworker allegedly used a derogatory term for gay men six days after the training. (ECF No. 78-7, ex. H; PSF ¶ 52c; DRPSF ¶ 52c). Ms. Fenton was asked whether she was concerned that "only six days later [after the training] there was an incident between [Mr. Garcia] and [Mr. Mateo] again?" (PSF ¶ 52c; DRPSF ¶ 52c). Ms. Fenton stated:

> I certainly can't control actions people take after training that I've obviously rolled out. What people choose to do is their own prerogative. So I can't necessarily say the two are related. If somebody doesn't take the training for how I roll it out, you know, obviously there's consequences for that.

(PSF ¶ 52c; DRPSF ¶ 52c). There are thus factual disputes as to whether NWNA took prompt and adequate remedial action—and whether any action was "reasonably calculated" to end the harassment.

### iii. *Ellerth/Faragher* Affirmative Defense[4]

NWNA claims to satisfy the *Ellerth/Faragher* affirmative defense to hostile work environment liability. Under *Ellerth*, in a hostile work environment lawsuit:

> When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages … [with] two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 764-65 (1998); *see also Faragher v. Boca Raton*, 524 U.S. 775, 777-78 (1998).

NWNA's *Ellerth/Faragher* argument is unavailing. First, the *Ellerth/Faragher* affirmative defense is available when a *supervisor* creates a hostile work environment for an employee. *See Fornicoia v. Haemonetics Corp.*, 131 F. App'x 867, 870-71 (3d Cir. 2005); *see also Ellerth*, 524 U.S. at 765. In this case, Mr. Mateo claims that many of his coworkers, including his supervisor, created a hostile work environment. Moreover, Mr. Mateo was terminated, which is a "tangible employment action." *See Ellerth*, 524 U.S. at 765 ("No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment."). Therefore, the *Ellerth/Faragher* affirmative defense cannot be applied on summary judgment.

Second, as discussed in subsection II.A.ii(b), NWNA has not proven, as a matter of law, that it exercised reasonable care to prevent and correct any harassment.

Third, NWNA has not met its burden to prove "that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective

---

4    The *Ellerth/Faragher* affirmative defense relates to vicarious liability. I will nonetheless discuss it separately in this subsection.

opportunities provided by the employer or to avoid harm otherwise." *Ellerth*, 524 U.S. at 764-65. NWNA claims that Mr. Mateo could have taken advantage of NWNA's sexual harassment policies by reporting any misconduct earlier. However, Mr. Mateo claims that he did submit complaints earlier. (PRDSF ¶ 29; ECF No. 87-3, exs. I, J). That is a material fact dispute. NWNA also claims that Mr. Mateo asked for confidentiality, and claims that this request tied its hands in terms of remedial action. (DSF ¶ 18). NWNA *also* states, however, that it cannot accommodate requests for confidentiality, because it must investigate all complaints. (DSF ¶ 18; PSF ¶ 49b; DRPSF ¶ 49b). Given this unclear record, I cannot apply the *Ellerth/Faragher* affirmative defense.

There is no other record that Mr. Mateo refused to take advantage of opportunities designed to alleviate the alleged hostile work environment. This contrasts with the record in *Swingle v. Henderson*, where an employee refused the offer of a replacement supervisor to prevent further sexual harassment. 142 F. Supp. 2d 625, 637-38 (D.N.J. 2001).

Ultimately, NWNA has not met its burden of showing that there is no dispute of material fact regarding the hostile work environment allegations. It also has not proven the *Ellerth/Faragher* affirmative defense because material facts relating to this defense are in dispute. I therefore decline to enter summary judgment for the defendant on counts II and VIII.

### B. Sex Discrimination (Gender Stereotyping) and Sexual Orientation Discrimination under Title VII and NJLAD

Discrimination claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). A Title VII or NJLAD discrimination case starts with the prima facie case. To prove a prima facie case of discrimination, a plaintiff must show that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of discrimination. *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410-11 (3d Cir. 1999); *see Tourtellote*

*v. Eli Lilly & Co.*, 636 F. App'x 831, 842 (3d Cir. 2016) ("[T]his Court's discrimination inquiry is the same for claims filed under Title VII and the NJLAD as the New Jersey statute borrows the federal standard set forth in *McDonnell Douglas*.").

If the plaintiff establishes a prima facie case, the burden shifts to the defendant to rebut the proof of discrimination by articulating some legitimate, nondiscriminatory reason for the employee's discharge. *Jones*, 198 F.3d at 412; *see also Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc). If the employer advances a legitimate, nondiscriminatory reason, "the court focuses on whether there is sufficient evidence from which a jury could conclude that the purported reasons for defendant's adverse employment actions were in actuality a pretext for intentional ... discrimination." *Jones*, 198 F.3d at 412-13. The plaintiff must convince the jury "*both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993).

NWNA does not specifically argue that Mr. Mateo cannot satisfy the first three elements of the prima facie case. Mr. Mateo likely satisfies those elements: he is a member of a protected class, *see infra subsection* III.D; he appears qualified for the position of forklift operator; and he was terminated. Rather, NWNA argues that Mr. Mateo cannot satisfy the fourth element of the prima facie case (inference of discrimination) and cannot demonstrate that NWNA's stated reason for his termination, a second altercation with a coworker, is a pretext for discrimination. (Def. Br. 16-19).

### i. Element (4): Inference of Discrimination

NWNA argues that Mr. Mateo's termination did not occur in circumstances giving rise to an inference of discrimination. (Def. Br. 16-19). NWNA claims that both the July 2013 fan incident and the August 2013 time clock incident were instigated by Mr. Mateo. (Def. Br. 16-17). However, these are disputed material facts. NWNA has produced notes from eyewitnesses and a report, but Mr. Mateo testifies otherwise. The court's role at summary

judgment is not to evaluate and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Credibility determinations are the province of the factfinder, not the judge on summary judgment. *See Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

Moreover, Mr. Mateo was terminated while there was an ongoing investigation of his July 2013 final written notice, which involved allegations of discrimination. This does not prove discrimination or pretext, but is reasonable evidence which a jury could use to find an inference of discrimination at the prima facie stage. *Cf. El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 932 (2d Cir. 2010) (finding that a Muslim employee terminated three weeks after he submitted a complaint for anti-Muslim harassment arguably established a prima facie case of retaliation under Title VII). Given the disputes of fact, Mr. Mateo could set forth a prima facie case.

### ii. Pretext

NWNA claims that even if Mr. Mateo could establish a prima facie case, NWNA presents a legitimate, nondiscriminatory reason for terminating Mr. Mateo—i.e., his alleged instigation of two altercations with coworkers. (Def. Br. 17-19). While there are material factual disputes regarding these altercations, NWNA (even if mistaken) might nevertheless have relied on them as a nondiscriminatory reason for termination. The burden would then shift to Mr. Mateo to prove that NWNA's proffered reason is a pretext for discrimination.

At the summary judgment stage, I must determine whether, making all facts and inferences in the light most favorable to Mr. Mateo, a reasonable jury could find that NWNA's proffered reason for Mr. Mateo's termination was a pretext for discrimination. *See Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 412-13 (3d Cir. 1999). Regarding the third stage of the *McDonnell Douglas* framework:

> [A] plaintiff may defeat a motion for summary judgment ... by pointing "to some evidence, direct or circumstantial, from which a

factfinder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."

*Jones*, 198 F.3d at 413 (citing *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994); *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1067 (3d Cir. 1996)). For example, "the plaintiff may show that the employer has previously discriminated against [the plaintiff], that the employer has previously discriminated against other persons within the plaintiff's protected class or within another protected class, or that the employer has treated more favorably similarly situated persons not within the protected class." *Simpson v. Kay Jewelers*, 142 F.3d 639, 645 (3d Cir. 1998).

Mr. Mateo may be able to show previous instances of discrimination or show that NWNA discriminated against other persons of his protected class. Here Mr. Mateo can defeat summary judgment by pointing to evidence that he was terminated for alleged altercations with coworkers, while Mr. Martinez and Mr. Garcia were not terminated for the same or similar behavior. This may show that NWNA has treated other individuals, who are not identified as gay men, differently than Mr. Mateo, who identifies as gay or bisexual. Mr. Martinez and Mr. Garcia continue to be employed by NWNA. (PSF ¶ 50a; DRPSF ¶¶ 50a, 62b, 62c). While NWNA claims that Mr. Mateo instigated these altercations, this is a dispute of material fact that is not appropriate for resolution on summary judgment.

NWNA claims that Mr. Mateo's circumstances are different because he was involved in altercations in close temporary proximity (i.e., July 2013 and August 2013) and was on a "final written warning" from the July 2013 incident. (Def. Br. 18). While this may be true, this is question of credibility and fact—not a question of law. Mr. Martinez has been accused of confronting Mr. Mateo with knives, making anti-gay remarks, and verbally confronting Mr. Mateo until they had to be separated by coworkers. Mr. Garcia has been accused of repeatedly using a derogatory term for gay men while looking at Mr.

Mateo, making anti-gay remarks, threatening to "f--- [Mr. Mateo] up," and instigating a fight. The reason that NWNA retained these employees and terminated Mr. Mateo is a question that turns on evidence presented and the credibility of the parties' testimony. When the evidence is not "so one-sided that one party must prevail as a matter of law," summary judgment is denied. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

Finally, NWNA argues that "any notion that NWNA discriminates against homosexual employees is belied by the employment of Debra Houston," an openly gay warehouse employee who does not complain of harassment or inappropriate conduct. (Def. Br. 19). This argument is unavailing. An employer cannot immunize itself from harassment claims simply by finding a member of the same protected class that does not complain of harassment. *Cf. Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1118 (3d Cir. 1997) (finding that "an employer can act with a discriminatory animus even when replacing a discharged employee with a member of the same protected class").

Ultimately, disputes of material fact prevent entry of summary judgment for NWNA on counts I, IV, and V.

### C. Retaliation under Title VII and NJLAD

Retaliation claims use a similar burden-shifting framework as harassment claims. To establish a prima facie case of retaliation under Title VII, a plaintiff must show evidence that "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006) (citing *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)).

If the plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). Then the burden shifts back to the plaintiff to prove that the

employer's proffered reason is pretext for discrimination. *Id.* To survive a motion for summary judgment in the employer's favor, a plaintiff must produce "sufficient evidence to raise a genuine issue of fact as to whether the employer's proffered reasons were not its true reasons for the challenged employment action." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500-01 (3d Cir. 1997); *Moore*, 461 F.3d at 342. The same test applies to NJLAD claims for retaliation. *See Davis v. City of Newark*, 417 F. App'x 201, 202 (3d Cir. 2011).

NWNA concedes that Mr. Mateo can establish the first two elements of the prima facie case for retaliation. (Def. Br. 20). Mr. Mateo submitted a July 27, 2013 complaint of discrimination and was terminated on September 3, 2013—while the complaint was still being investigated. (Def. Br. 20). NWNA argues that Mr. Mateo lacks evidence of "a causal connection" between the submission of the complaint and the termination.

Courts focus on two main factors in evaluating the causal link necessary for the third element of the prima facie case of retaliation: timing and evidence on ongoing antagonism. *Abrahamson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 288-89 (3d Cir. 2001). Regarding timing, "the mere fact that adverse employment action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997). Temporal proximity may be used to infer a causal link under "unusually suggestive" circumstances. *See, e.g., Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (finding plaintiff had demonstrated a causal link where "discharge followed rapidly, only two days later, upon [defendant's] receipt of notice of [plaintiff's] EEOC claim"). Mr. Mateo was terminated on September 3, 2013. NWNA claims that he first "advised anyone at NWNA that he was gay" on July 27, 2013;[5] he also made allegations against several coworkers and his supervisor around this time. (DSF ¶¶ 29, 31). The two are fairly close in time,

---

[5]     This fact is disputed by Mr. Mateo.

but it is not necessary to rely on timing alone because Mr. Mateo has presented additional evidence of a causal nexus.

"[A] plaintiff may rely upon a broad array of evidence" to illustrate a "causal link" for purposes of establishing a prima facie case of retaliation. *See Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 283-84 (3d Cir. 2000). NWNA claims that Mr. Mateo was terminated because of two disciplinary incidents. However, NWNA did not terminate Mr. Martinez or Mr. Garcia, the other individuals who were involved in these alleged altercations, even though they each had at least one other altercation with Mr. Mateo. In Garcia's case, the altercation allegedly involved harassing language, and in the other Mr. Rodriguez allegedly started aggressive knife play without provocation. Mr. Mateo was terminated for two conflicts with coworkers, while Mr. Martinez and Mr. Garcia were not terminated after each had at least two altercations with coworkers. Mr. Mateo thus has offered enough evidence that a jury could reasonably conclude that NWNA's proffered reason for terminating Mr. Mateo was pretext for retaliation.

For those reasons, summary judgment for the defendant is denied as to counts III and VIII.

### D. Sexual Orientation Discrimination under Title VII/NJLAD

Although the parties do not raise this issue, whether Title VII prohibits discrimination based on "sexual orientation" remains contested. The Third Circuit has found that discrimination against gays and lesbians is prohibited under Title VII insofar as it involves discrimination based on sex and gender stereotypes. *See Prowel v. Wise Business Forms, Inc.*, 579 F.3d 285 (3d Cir. 2009) (finding that a factual question existed whether a gay man was harassed because of his gender or his sexual orientation). Recent cases from the Second Circuit and Seventh Circuit have found that sexual orientation discrimination is prohibited by Title VII. *See Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 132 (2d Cir. 2018) (holding that plaintiffs are "entitled to bring a Title VII claim for discrimination based on sexual orientation"); *Hively v. Ivy Tech Cmty. College,*

853 F.3d 339, 351-52 (7th Cir. 2017) (holding that "a person who alleges that she experienced employment discrimination on the basis of her sexual orientation has put forth a case of sex discrimination for Title VII purposes"). Other courts have held directly that Title VII prohibits sexual orientation discrimination. *See, e.g., Burnett v. Union R.R. Co.*, No. 17-cv-101, 2017 WL 2731284, at *3-4 (W.D. Pa. June 26, 2017); *Winstead v. Lafayette Cty. Bd. of Cty. Comm'rs*, 197 F. Supp. 3d 1334, 1346 (N.D. Fla. 2016); *EEOC v. Scott Med. Health Ctr., P.C.*, 217 F. Supp. 3d 834, 841 (W.D. Pa. 2016); *Isaacs v. Felder Servs., LLC*, 143 F. Supp. 3d 1190, 1193 (M.D. Ala. 2015); *see also Franchina v. City of Providence*, 881 F.3d 32, 54 n.19 (1st Cir. 2018) (questioning precedent stating that Title VII does not prohibit sexual orientation discrimination).

Regardless, it is indisputable that Mr. Mateo can pursue a sexual orientation discrimination claim under NJLAD. The NJLAD explicitly prohibits discrimination "because of ... affectional or sexual orientation ...." N.J. Stat. Ann. § 10:5-3; *see also Lewis v. Harris*, 908 A.2d 196, 213-14 (N.J. 2006) (stating that the NJLAD "prohibit[s] discrimination on the basis of 'affectional or sexual orientation'").

### E. After-Acquired Evidence Doctrine

Sometimes, after terminating an employee, an employer finds evidence of employee wrongdoing that would have justified terminating the employee. Employers can present this after-acquired evidence in discrimination lawsuits to potentially limit liability.

If a defendant employer in a Title VII case finds evidence of employee wrongdoing, which otherwise would have resulted in the employee's discharge, that after-acquired evidence can limit or eliminate the employer's Title VII liability. *See McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 356-57 (1995); *Mardell v. Harvleysville Life Ins. Co.*, 65 F.3d 1072, 1073-74 (3d Cir. 1995); *Cicchetti v. Morris County Sheriff's Office*, 947 A.2d 626, 634 (N.J. 2008). For instance, the New Jersey Supreme Court has held that an individual who

was statutorily barred from public employment, but was hired by concealing that disqualification, is generally precluded from pursuing a claim for wrongful termination. *See Cedeno v. Montclair State Univ.*, 750 A.2d 73 (N.J. 2000).

The Third Circuit has held that a "'would have fired standard,' rather than 'would not have hired' standard, applies to after-acquired evidence of resume fraud in discriminatory discharge case[s]." *Mardell*, 65 F.3d at 1073-74 (citing *Shattuck v. Kinetic Concepts, Inc.*, 49 F.3d 1106, 1108-09 (5th Cir. 1995)). Therefore, if an employer obtains after-acquired evidence of resume fraud and the employer proves that it would have terminated the plaintiff's employment for resume fraud, an employee is entitled to backpay only from discharge to the time that the wrongdoing was discovered. *Mardell*, 65 F.3d at 1073-74. Notably, "truly exceptional circumstances may be considered in fashioning appropriate relief" beyond this rule. *Id.* at 1074.

NWNA argues that Mr. Mateo misrepresented his previous employment and his reasons for leaving those jobs. NWNA also states that it did not know of this "resume fraud" until after Mr. Mateo's termination. (DSF ¶ 59). There are substantial disagreements about this evidence: NWNA provides documents which purport to show that Mr. Mateo has been fired from previous jobs because of absences, "put[ting] employees and customers in danger," "insubordination," "poor work performance," and allegedly falsifying his time sheet. (DSF ¶¶ 52, 54, 57, 58; PRDSF ¶ 54; ECF No. 78-7, exs. P, Q, S). Mr. Mateo disputes the authenticity of these documents and claims that they "do[] not describe the events that occurred." (PRDSF ¶ 52; ECF No. 78-7, ex. P; Mateo Dep. 85:20-86:20). Moreover, Mr. Mateo notes that his resume, produced by defendants in discovery, lists six of the seven prior employers that Mr. Mateo allegedly omitted. (PRDSF ¶ 55; ECF No. 78-7, ex. R).

NWNA claims that it would not have hired Mr. Mateo if it had known about the "misrepresentations, misstatements of fact and significant omissions set forth in his employment application." (DSF ¶ 60). NWNA alleges that it would have terminated Mr. Mateo "immediately upon learning of those

31

misstatements of fact and significant omissions." (DSF ¶ 60). NWNA states that it has terminated or refused to hire at least two other individuals for lying on their employment applications. (DSF ¶¶ 61-63).

Assuming, *arguendo*, that NWNA can establish that Mr. Mateo committed resume fraud, Mr. Mateo can still claim a Title VII backpay award up until the date NWNA discovered the resume fraud. *See Mardell*, 65 F.3d at 1073-74.

Moreover, any non-economic loss, such as damages for emotional distress and punitive damages, would not be limited by the after-acquired evidence doctrine—at least regarding NJLAD violations. *See Taylor v. Int'l Maytex Tank Terminal Corp.*, 810 A.2d 1109, 1118 (N.J. Super. Ct. App. Div. 2002). As explained by the New Jersey Appellate Division:

> Unlike wage-based claims, a non-economic loss, such as emotional distress, if proven, relates to injuries that have no direct nexus to a plaintiff's status as an employee. Instead, they embody damages resulting from alleged misconduct of an employer, which, although directed at an employee, is nevertheless subject to redress because of indignities suffered, not because of the person's status as an employee. An employer who creates a hostile work environment should not be excused from responding in damages for personal injuries caused by its discriminatory conduct simply because it later learns that the injured employee did something in the past, which, if known at the time, would have caused his or her termination. The same rationale applies to claims for punitive damages, which are intended to deter especially egregious conduct, such as actual participation by upper management or willful indifference.

*Id.* at 1118-19.

NWNA argues that summary judgment could be granted on the issue of after-acquired evidence. (Def. Br. 23-27; Def. Reply 6-7). However, Mr. Mateo might still be awarded certain damages even if NWNA succeeds on its after-acquired evidence defense. Mr. Mateo could be awarded emotional distress damages, punitive damages, or (appropriately limited) backpay

damages. I therefore decline to enter summary judgment for NWNA on the issue of after-acquired evidence.

## IV. CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is denied. An appropriate order accompanies this opinion.

Dated: April 16, 2018

**KEVIN MCNULTY**
**United States District Judge**